Matter of Two Spring Assoc. v New York City Loft Bd. (2003 NY Slip Op 23902)

Matter of Two Spring Assoc. v New York City Loft Bd.

2003 NY Slip Op 23902 [2 Misc 3d 530]

December 15, 2003

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, April 7, 2004

[*1]
In the Matter of Two Spring Associates, Petitioner,
v
New York City Loft Board et al., Respondents.
Supreme Court, New York County, December 15, 2003

APPEARANCES OF COUNSEL

Smith & Shapiro, New York City (Harry Shapiro of counsel), for petitioner. Michael A. Cardozo, Corporation Counsel, New York City (Deborah Rand of counsel), for respondents. Robert Petrucci, New York City, for Andrew Bolotowsky.

{**2 Misc 3d at 530} OPINION OF THE COURT

Michael D. Stallman, J.
{**2 Misc 3d at 531}This CPLR article 78 proceeding requires the court to determine whether intervening rent regulation governs a lease renewal option and rent increase formula contracted before the change in law but exercised and effective thereafter. Petitioner Two Spring Associates seeks a judgment vacating the determination of respondent New York City Loft Board which granted an application by tenant-intervenor Andrew Bolotowsky for an order determining the lawful rent for the subject unit and determining that petitioner owner had overcharged the tenant.
Petitioner is the landlord of premises known as Two Spring Street, in Manhattan; Bolotowsky is the tenant of unit 1W/5E/5W in the building. The building has been covered under the Loft Law (Multiple Dwelling Law art 7-C) from its enactment in 1982. Andrew Bolotowsky, along with his mother and father, moved into the subject building in 1979. The Bolotowskys had a five-year lease from 1979 to 1984, providing for a monthly rent of $1,075. When the parties signed the original lease, the premises and the rent were unregulated; the Loft Law had not yet been enacted.
Paragraph 42 of the lease permitted the tenant to renew the lease for a two-year period, and provided that the renewal lease rent was to be $1,075 per month plus a cost of living adjustment based on increases in the Department of Labor's Consumer Price Index (CPI).
In December 1983, prior to the expiration of the lease, the tenant exercised his option to renew under paragraph 42. Although the owner initially rejected the tenant's attempt to renew the lease, it later took the position that the lease was renewable, but asserted that under the CPI escalation clause, it was entitled to a 42% increase. The landlord based its position on a 42% CPI increase during the original term. Beginning in August 1984, the tenant began paying $1,505 per month, as demanded by the landlord. In April 1989, the tenant began paying $1,610.35 per month.
The owner received further rent increases, as a result of the issuance of an alteration permit for the building, and the procurement of a residential certificate of occupancy. As of December 2001, the tenant began paying $1,954.14 per month.
Subsequently, the tenant brought a proceeding before the Loft Board to determine the legal rent, and maintained that an overcharge had occurred. The facts were not in dispute, but owner and tenant disagreed about the amount of rent lawfully chargeable by the owner. At issue before the Loft Board, and here, {**2 Misc 3d at 532}is the relationship of the 1982 Loft Law with the pre-1982 lease and its post-1982 renewal.
Loft Board Order No. 1, which is now codified as 29 RCNY 2-06, describes certain formulas for addition of specified increases to the base rent. The regulation provides in relevant part:
"These rent guidelines apply to units of interim multiple dwellings ('IMDs') . . . whose leases or rental agreements are in effect on December 21, 1982, but expire prior to the IMDs' compliance with the safety and fire protection standards of Article 7-B of the Multiple Dwelling Law . . . The effective date of these rent increases . . . will be the next regular rent payment following December 21, 1982, or following the expiration of the lease or rental agreement, whichever is later . . . ." (29 RCNY 2-06 [a] [1] [ii]; [b].)
The Loft Board considered whether the initial base rent, for purposes of calculation of subsequent rent increases, was the monthly rent paid in December 1982, or the rent paid in March 1986, when the renewal term had ended. Administrative Law Judge (ALJ) Spooner of the Office of Administrative Trials and Hearings issued a report and recommendation finding that increases should be based upon the rental amount set forth by the original terms of the 1979 lease as of December 1982, and calculated the legal regulated rent based on the $1,075 initial base rent. The Loft Board then adopted Judge Spooner's recommendations, and determined the amount of the overcharge to be $14,151.18. Petitioner then commenced the instant article 78 proceeding.
Petitioner's position, before both the Loft Board and this court, is that the renewal lease effected a continuation of the 1979 lease until 1986, and that any increases permissible under paragraph 42 of the lease were lawfully added by the owner for purposes of calculating the base rent. In other words, petitioner asserts that the exercise of an option to renew a lease during the lease term does not create a renewal lease, but merely extends the original lease. In petitioner's view, although Loft Board Order No. 1 might have limited increases on leases newly created after the enactment of the Loft Law, it did not affect pre-Loft Law leases that continued pursuant to contractual renewal provisions. Thus, according to petitioner, it was lawful to require the tenant to pay $1,505 monthly under the renewal lease, and no overcharge occurred.{**2 Misc 3d at 533}
The tenant's position, essentially adopted by the Loft Board, is that the lease was effectively renewed pursuant to the provisions of paragraph 42; however, because of the enactment of the Loft Law and Loft Board Order No. 1, the owner could not permissibly collect any rent in excess of that permitted under the terms of Loft Board Order No. 1. Thus, according to respondent tenant, the lawful monthly rent on the renewal lease was $1,075 and the tenant was overcharged.
It is well established that, while the rent regulation statutes do not abrogate an existing lease's renewal provision, the landlord may not demand, for the renewal period, payment of rent in excess of the regulated rent (United States Trust Co. v Nedab Holding Corp., 197 Misc 310 [Sup Ct, NY County 1949], affd 277 App Div 853 [1st Dept 1950]; Warfield v Belanca Robe Corp., 186 Misc 910 [Mun Ct 1946], affd 187 Misc 731 [App Term, 1st Dept 1946], affd 271 App Div 781 [1st Dept 1946]; Plessdore Realty Corp. v Fasano, 188 Misc 975 [Sup Ct, Queens County 1947]). Administrative Law Judge Spooner relied on other loft cases in accord. (Matter of McCready, Loft Bd Order No. 931, 9 Loft Bd Rptr 117 [July 17, 1989]; Matter of Palubniak, Loft Bd Order No. 646, 6 Loft Bd Rptr 222 [Aug. 27, 1987]; Fink v Ross, NYLJ, Jan. 24, 1994, at 31, col 1 [Civ Ct, Kings County] [holding that rent increases in conflict with the Loft Law were not to be added to lease renewals after December 21, 1982].)
Petitioner attempts to distinguish this case on the ground that it concerns a lease renewal option which the tenant exercised prior to the expiration of the lease. The above-cited cases did not concern lease provisions permitting the tenant to extend the lease under a formula set by the lease; those cases involved execution of new leases, not extensions of existing leases. Petitioner relies on Dime Sav. Bank of N.Y. v Montague St. Realty Assoc. (90 NY2d 539 [1997]) for the proposition that where an original lease contains an option to renew, exercise of the option by the tenant extends the term of the original agreement, and does not create a renewal lease.
The Loft Board and respondent do not take issue with the general proposition of law stated in Dime. However, it has been consistently held in nonloft rent regulation cases that an agreement to waive the benefits of the rent regulation laws is void as against public policy (see e.g., Rent Stabilization Code [9 NYCRR] § 2520.13; Matter of Missionary Sisters of Sacred Heart, Ill. v New York State Div. of Hous. & Community Renewal,{**2 Misc 3d at 534} 283 AD2d 284 [1st Dept 2001]). There is no logical reason to apply a different rule in the case of buildings covered by the Loft Law. In Matter of Zelmanoff (Loft Bd Order No. 939, Aug. 17, 1989), the Loft Board invalidated an agreement under which a building occupant would have been required to cease using the unit for residential purposes. Zelmanoff invalidated an agreement made in 1983, the same year as the instant option was exercised. Both postdated the Loft Law. The same principles should apply here to an option agreement negotiated before the change in law, but exercised after the change, where the agreement calls for rent increases that are inconsistent with the provisions of the Loft Law.
Petitioner draws a distinction without a difference. The option was exercised and the renewal took effect after the change in the law notwithstanding its execution according to the parties' pre-Loft Law original agreement. However one views the renewal effected by the option's exercisewhether as an agreement to continue the original lease under substantially the same terms, or a new agreementit is governed by the applicable law at the time the renewal came into effect. Accordingly, ALJ Spooner correctly determined that the initial base rent should be the $1,075 in effect as of December 1982, when the Loft Law became effective and correctly calculated the legally regulated rent based on that figure.
Nothing in Dime Sav. Bank of N.Y. v Montague St. Realty Assoc. (90 NY2d 539 [1997]) related to rent regulation or to an intervening change in the law. It would be contrary to public policy, under the circumstances presented here, to hold that exercise of an option to renew relates back so as to exempt the parties from intervening law in effect when the option was exercised.
The Loft Law was remedial legislation intended to protect residential tenants of formerly commercial space by legitimizing their status; it thereby helped revitalize former manufacturing districts by expanding the stock of affordable housing. (See Matter of Lower Manhattan Loft Tenants v New [*2]York City Loft Bd., 104 AD2d 223.) To hold as petitioner urges would only encourage owners to draft option clauses in original leases so as to preempt any subsequent changes in the law.
If petitioner were permitted to obtain the CPI increase solely because the tenant's occupancy is deemed to have continued because of an extension rather than by a new lease, the intent of the Loft Law would be frustrated (see Matter of 902 Assoc. v New York City Loft Bd., 229 AD2d 351 [1st Dept 1996]).{**2 Misc 3d at 535}
In sum, although the renewal extended the term of the tenancy, the enactment of the Loft Law precluded the owner from adding the CPI increase to the rent. Thus, the determination of the Loft Board, setting the lawful rent without adding the CPI increase described in paragraph 42 of the lease, had a rational basis and was neither arbitrary nor capricious nor contrary to law. (See Matter of Bernstein v Toia, 43 NY2d 437 [1977].)
Accordingly, it is adjudged that the petition is denied and the proceeding is dismissed, with costs and disbursements to respondent.